**LAGUNA ROYALTY COMPANY et al.,**
**Appellant,**

v.

**Clarence L. MARSH et ux., Appellee.**

**No. 21704.**

United States Court of Appeals
Fifth Circuit.

Sept. 3, 1965.

Rehearing Denied Oct. 8, 1965.

Orrin W. Johnson, Joel William Ellis, Harlingen, Tex., for appellant.

Albert E. Coneway, Coneway & Forrester, Harlingen, Tex., for appellees.

Before BROWN and GEWIN, Circuit Judges, and KILKENNY,[*] District Judge.

JOHN R. BROWN, Circuit Judge.

This appeal is by the working interest owners and holders of overriding royalties[1] of an oil and gas lease who lost[2] their lawsuit below against the landowner-lessor Marsh[3] who, as a matter of law,[4] unlawfully expelled the operator from the lease, and allegedly damaged their well beyond repair by having a bridge plug inserted above both producing sands. However, the jury by its "No" answer to interrogatory No. 1, in the light of the Court's instruction, evidently believed either (a) that Rex Kelso, the operator of the well had by his own acts previously destroyed the well or (b) that the well was so depleted as to be no longer commercially productive regardless of who destroyed it. As to this judgment, a variety of errors are asserted. Also very much involved is the Trial Judge's refusal to grant plaintiffs' motion to vacate under F.R.Civ.P. 60(b) on the ground of newly discovered evidence.[5] We affirm on the main appeal and remand for further 60(b) proceedings.

Much of the history of the lease and the well is revealed by the facts found by the Texas State Court in an earlier proceeding between the same parties to determine the validity of the lease.

Landowner Marsh granted a lease on 340 acres in 1946. In 1948 a portion of it along with other acreage was unitized into the 320-acre "Marsh #1 unit"—the subject lease. Also in 1948, the "Marsh #1 well" was drilled and completed, and this well continued to produce gas, condensate and distillate in commercial quantities up to the time it was shut-in on April 1, 1961 on orders of the then operator, William A. Parker, a Bostonian who operated the well by mail and employing a local manager.

The well was then in need of repairs and reworking. Parker, on April 1, 1961, for about $17,000 sold the well equipment in place to plaintiff Western Oil Corp. along with an option to buy the leases, which option was subsequently exercised on or about May 8, 1961. Western Oil thereby became the owner of the working interest and hence the operator of the well (and lease).

Not before the State Court apparently were the facts that Kelso was retained by Western to look over the well in anticipation either of salvaging the equipment or reworking and operating the well. The well was a dual completion gas well producing in what were known as the "A" sand at approximately 7170–80 feet and the "D" sand at approximately 7490–7500 feet. The A sand was a closed reservoir which produced by decreasing pressure, whereas the D sand was a field-wide blanket sand produced by water drive. The dual completion was accomplished by inserting tubing inside the casing. The A sand was tapped by perforating only the casing and allowing the gas to flow up the annulus (circular open space between the tubing and the casing). Then the D sand was produced by perforating both the casing and the

---

[*] Of the District of Oregon, sitting by designation.

1. There were 22 plaintiffs or groups of plaintiffs, the most significant for our purposes being lease operator Rex Kelso. The others will be identified by name only where important.

2. Actually, the jury returned a verdict for Kelso in the amount of $580 for loss of equipment. Plaintiffs were unsuccessful, however, on their claims for lost production, well damage, and exemplary damages.

3. Clarence L. Marsh and his wife were both named as defendants but will be referred to only as "Marsh."

4. This, by virtue of a res judicata Texas State Court judgment determining this issue (see note 6, infra).

5. The appeals from the main judgment and from subsequent denial of 60(b) relief were consolidated.

tubing. And with a "packer" set to seal off the annulus between the A and D sands, the D sand gas would flow up the tubing to the well head.

Production had declined to the point where Parker no longer considered it profitable to operate the well. Kelso then acting for Western Oil thought the well could be operated more cheaply— particularly since he could do much of the work himself, and also that a rework might restore the well to substantial productivity. Thus on about April 18, Kelso removed the packer separating the sands and also the tubing from the well to examine it. To prevent the higher pressure A sand gas from migrating down the casing and communicating with the D sand, which would destroy the A sand's productivity, he filled the casing with a column of water. He apparently thought that salt water was used, but the Federal Court testimony of the well service people who did the work showed that actually fresh water from a canal was used. The well stood in this condition for about two months.

Shortly after this, Kelso acquired Western's interest and became the operator. Former operator Parker had been plagued by unusually large overriding royalties, so that the working interest represented only 61% of production. Worse, some of these overrides had

a conversion feature so that after a certain amount was paid, they would convert to working interest, thus further reducing Parker or his assigns' interest to around 40%. Kelso, however, was successful in obtaining assignments of enough overrides to make further operation profitable in his opinion.

On May 30 Kelso was ready to begin reworking operations. Under the lease he had 60 days after cessation of production to redrill, or begin reworking. Otherwise, the lease would be forfeited unless he paid the appropriate shut-in royalty.

In the meantime, however, Marsh had decided to try to take over the well and operate it himself. Pursuant to this plan, he had entered a lease agreement with another company for the deeper sands ostensibly reserving to himself the A and D sands thereby avoiding an apparent slander of the Parker-Kelso lease title. The agreement also provided that he was to file suit to cancel the Parker-Kelso lease, which he subsequently did. The result, however, was adverse to Marsh since it culminated finally in the previously mentioned State Court judgment expressly declaring that Kelso's lease was valid and subsisting.[6]

While preparing to commence reworking operations on May 30, Kelso learned that a canal had been constructed be-

---

6. Marsh filed the State Court action for declaratory judgment in July 1961 against essentially all of the persons who were later to become the plaintiffs in the Federal Court case before us (filed June 28, 1962). On March 25, 1963, the case came on for hearing in the State Court. The Judge granted the Marshes a voluntary nonsuit without prejudice to the rights of the other parties to seek and obtain affirmative relief. The defendants moved for judgment *nihil dicit* against the Marshes which was granted along with their request that the Court make findings and conclusions with regard to cross and third party claims filed by various of the numerous defendants. This the State Judge did, declaring the ownership of the overrides and the working interest. He held Kelso's lease to be valid and subsisting. His supporting fact findings reflect that Marsh wrote the let-

ter of ouster and interfered with Kelso's rework attempt. The findings also recite that up to the time the well was shut-in April 1, 1961, it produced in commercial quantities.

The Federal Court cases was tried on the theory, advanced by both parties under different wraps, that to some extent—often a subject of dispute—the State Court judgment was res judicata.

An interesting theory, advanced by Marsh's motion to dismiss and answer, was that the plaintiff's Federal Court claim for damages was a compulsory counterclaim and therefore barred by non-assertion, cf. Tex.R.Civ.P. 97(a). We are pointed to no ruling by the Trial Court on this, and as Marsh took no notice of appeal and has not asserted this in any way, we conclude it is not before us.

tween the access road and the well site, and that the field had been watered so as to make the way impassable to heavy machinery. This was no act of God. A remarkable piece of self-help, it was the act of Marsh. But Kelso was tending his own fences for on May 31 he paid a shut-in royalty payment. On June 3 he received a letter from Marsh's attorney asserting that the lease had terminated (June 1 apparently) and notifying him:

"* * * that Mr. Marsh does and will consider you a trespasser in and upon his property * * * for all purposes excepting the removal of [certain salvage equipment], and that you will be held accountable for any and all damages resulting to the property of Mr. Marsh, including the minerals underlying same by reason of any trespass * * *."

On June 6 Kelso, reserving all rights and bowing only to this modern confrontation of force, replied that he was complying with the Marsh demand. He spelled out the details of his planned, but now frustrated, rework and the payment of the shut-in royalty. He sounded this note of caution:

"The rights of the overriding royalty owners should not be overlooked in this situation. If because of delay in recompletion of the well, they lose a certain amount of production therefrom, I do not wish to personally absorb any responsibility on account of this loss."

At the end of June, Marsh went to the well-site and heard the hissing of gas in an amount which to him seemed dangerous. It was Marsh's action to this situation which formed the principal basis for the instant Federal Court suit. Marsh hired J & M Well Service to fix this. Mr. McGuffin who did this work for the company, had also done the job for Kelso in April. He explained to Marsh three ways to remedy the escape of gas, and Marsh chose the least expensive. McGuffin first bled off the gas which had come up through the water (now down 1800 feet) left by Kelso, and then set a bridge plug above both sands at 5000 feet and capped the well. This meant that unless possibly inhibited from the weight of the remaining column of water, gas from higher pressure $A$ sand could be forced out into the $D$ sand at the lower horizon. McGuffin testified that he would not have recommended this had he known that it was a dual completion well and any hopes remained for future production. Neither Kelso nor any of the other interested individuals were given any notice of these acts by Marsh. According to the plaintiffs' theory, supported by expert testimony, doing this to the well meant that as the water receded into the formations (primarily the low pressure $D$ sand), the $A$ sand with far greater pressure would migrate down into the $D$ sand and be dissipated throughout the field, forever unrecoverable to the lease. It was Kelso's view that the $A$ sand was by far the more valuable, having yet several years of 1000 mcf-day production potential.

The well remained like this for about 15 months until September 1962 when the Receiver appointed in conjunction with the State Court proceeding (note 6, supra) had the bridge plug drilled out, the plug replaced with one below the $A$ sand, the tubing inserted with packer above the $A$ sand, and the well swabbed and tested. There was no pressure, and gas sufficient to ignite came only when the well was being swabbed. Apparently everyone at this point believed the well was ruined. At any rate, no further efforts were made to restore it.

A dead well then came to be the subject of a very lively lawsuit.

Trial began on November 12, 1963. Marsh began putting on evidence on November 14, and from his cross examination of plaintiffs' witnesses and his own early evidence, it seemed clear that the main line of defense was that the well was so depleted by April 1961 that it could no longer produce commercially. Hence, no damages no matter how improper his June acts might have been. This was supported by extensive expert and other testimony on the status of the reserves accompanied by testimony from

the former operator Parker's bookkeeper-manager on operating expenses. On November 15, the trial was recessed to reconvene November 25, but due to the assassination of President Kennedy, trial was not resumed until December 2. On that day Marsh sought and was granted leave to file a trial amendment asserting the affirmative defense that Kelso's own April 18 acts of removing the tubing and packer and filling the well bore with water was the sole proximate cause of the damage to the wall. In support of this theory, strong proof was adduced that actually fresh water, not brine, was put in the well in April. Expert testimony was proffered showing two main things. First, a strong possibility existed that the sands in this area [7] were "bentonitic," containing a clay-like mineral substance called "Motmorillointonite" which would expand upon contact with water, introduced from the outside, particularly fresh water, causing the sands to swell. This would decrease the porosity of the sand and prevent the gas from flowing into the well—thus ending the productivity of this well.

This evidence was countered by expert testimony to the contrary, but all of the experts on both sides were in agreement that the only way to determine for sure whether the sands underlying the Marsh lease were bentonitic was by analysis of cores taken from them. All acknowledged that no such core analyses existed. Despite this testimony under the trial amendment, however, the greater weight of the testimony—at least in record poundage if not effect—dealt with the other defensive theory concerning the extent of depletion of the gas

reserves and the costs of operation. Or stated affirmatively, the emphasis was on this query: What was the productive expectancy of the well had Marsh not committed his June acts?

Plaintiffs requested that the case be submitted to the jury on special interrogatories, and both sides submitted suggested issues following the stilted pattern of Texas State Court submission. Accompanied by an extended oral general charge, the Trial Judge submitted 16 interrogatories, several of which varied materially from those requested. The key issue was framed by No. 1:

"Do you find .* * * that the tampering with the Marsh No. 1 well by the Marshes, * * * was a proximate cause * * * of damage to the productive capacity, if any, of such well?"

Answer: "Yes" or "No".

This inquiry was the same as the plaintiffs' requested issue. But by suitable accompanying written instruction, the Court conditioned answers to all other issues [8] upon the jury's first answering "Yes" to No. 1. However, in the form requested by the plaintiffs, a "Yes" answer to No. 1 was a condition precedent only to their requested No. 2. Requested No. 2 inquired about the amount of damage to the well itself (other than recoverable reserves), or if the well was damaged beyond repair, the cost of a new well. The remainder of all of the issues were, therefore, to be answered even though the jury answered "No" to No. 1. In contrast the Court's conditioning, however, prevented the jury from considering all remaining interrogatories which dealt with damages for lost production.[9]

---

7. Hidalgo County in the Rio Grande Valley very near the Gulf of Mexico.

8. Except 10 and 11 which asked about certain lost equipment for which plaintiffs recovered judgment for $580.

9. See, e.g., Interrogatory No. 3:
    "What do you find * * * was the average number of cubic feet of gas per day, if any, that would have been produced from the "A" sand of the Marsh No. 1 well during the period from June

30, 1961, to the end of the ordinary life of the well if the [Marshes] had not caused the letter of June 3, 1961, to be delivered to Plaintiff Kelso and tampered with the Marsh No. 1 well on or about June 30, 1961?
"Answer in number of cubic feet per day, if any."
    Interrogatory No. 5 made the same inquiry as to the D sand, and No. 6 inquired about distillate production.

Although full opportunity was afforded and many objections were made by them, the plaintiffs made no objection to this form of conditioning. Of course, each of the issues as requested called for unconditional submission of the questions concerning expected production over the life of the well and expected operating costs. But nothing in what was said or negatively implied by these requested issues fairly advised the Judge, F.R. Civ.P. 51, that the plaintiffs had any complaint on this score.

By the Court's accompanying oral charge, the jury was instructed that it could answer No. 1 "No" if it found either (a) that the well was already depleted to point below commercial productivity, or (b) that Kelso's actions had already destroyed the well. Again, there was no objection to this charge perhaps because this kind of dual (maybe triple) instruction was implicit in the issue as requested by the plaintiffs, i. e., "damage to the productive capacity, *if any,* of such well." The jury answered "No" and that was it for the plaintiffs except for the $580 for equipment damage. The Court overruled post-verdict motions for additional findings, F.R.Civ.P. 49(a), for judgment n. o. v., and for a new trial.

Then, months later, on April 9, 1964, plaintiffs filed a motion to vacate the judgment pursuant to F.R.Civ.P. 60(b) asking that they be given a new trial relying on grounds (1) "surprise," (2) "newly discovered evidence," and (3) "misrepresentation" [by defendants' witnesses] of that rule. The gist of the motion was that after the trial, the working interest was transferred by Kelso to Birdwell & Brady who drilled and completed a commercially producing well on Lot 2 of the Marsh No. 1 unit. This was a 40-acre tract adjoining diagonally to the northwest, Lot 8, upon which the Marsh No. 1 was drilled.[10] The well was dually completed at 7077 and 7465 feet. The bottom sand was apparently the field-wide *D* sand, and the higher sand was known as the *J-2* sand, lying about 100 feet above the *A* sand underlying the Marsh No. 1, which, it was determined, had shaled out at this particular point. These claims were supported by the affidavits of operator Birdwell and plaintiffs' counsel-litigant. Of great benefit but which must be regarded as incidental since it could not have been the basis for 60(b) relief, this evidence indicated that perhaps there was substantial production to be had from the *D* sands which even the plaintiffs' witnesses had viewed as marginal. But more important, cores from both of the producing sands in the new well were removed and subjected to analysis in the Dow Chemical laboratories to determine if the sands were subject to swelling upon contact with fresh water. The Dow affidavit revealed the results of the clay swelling tests. After an apparently thorough examination, the conclusion was simply that "no significant swelling occurs in fresh water, Brine, or spent acid."

This was buttressed by the affidavit of Birdwell who stated that the well was drilled without the precautionary measures ordinarily taken where bentonitic conditions were feared. Based on his experience and the core analysis, he expressed the opinion that "the field productive sands which underlay the Marsh #1 Well were not subject to significant or damaging swelling when left in contact with fresh water or salt water."

There was a hearing before the Trial Judge on the 60(b) motion. He heard plenty, but mostly it was the explanatory comments and argumentive contentions of counsel with reference to the affidavits. No testimony was taken, no experts called to evaluate these new offerings, nor was the Court asked to hear any.

In denying the relief, the Judge did not seem to question that the affidavits

These substantially tracked the plaintiffs' requested issues, e.g., 3, 4, 5, 6 which, however, contemplated unconditional submission.

10. Judging from the maps introduced, the two well sites must be in the neighborhood of 1500 feet apart.

said what counsel said they said. He did, however, recall that Rogers, a geology instructor from Pan American College, had testified he thought the sands could well be bentonitic. In the colloquy he had, however, acknowledged that a core would offer superior basis for judgment and that all he knew about this particular well was from a brief study and what he heard in the court room. Rather, in overruling the motion the Trial Judge assigned two reasons, one general, the other quite specific: (1) that the new evidence only went to "bolster" their trial evidence, and (2) "that the jury's ["No"] answer to interrogatory Number 1 could have been based on many other findings other than the fact that the sweet water hurt the sand." Reason (2) obviously referred to the Judge's charge that the jury could answer "No" to No. 1 if they found the well had no productive capacity, hence Marsh didn't do any damage.

Although it appears to reverse horse and cart, we dispose first of the 60(b) problem since this eliminates much repetition.

■ In analyzing the 60(b) aspect, we recognize that Rule 60(b) [11] is to be construed liberally to do substantial justice. Serio v. Badger Mut. Ins. Co., 5 Cir., 1959, 266 F.2d 418; 3 Barron & Holtzoff, Federal Practice & Procedure §§ 1322, 1328 (Wright ed. 1958). The rule is broadly phrased and many of the itemized grounds are overlapping, freeing Courts to do justice in hard cases where the circumstances generally measure up to one or more of the itemized grounds. Subsection (6), note 11, supra, has been construed as intending to "make available those grounds which equity has long recognized as a basis for relief." Bros, Inc. v. W. E. Grace Mfg. Co., 5

Cir., 1963, 320 F.2d 594, 608; 3 Barron & Holtzoff, § 1329.

We do not minimize the doubts which this record generates as to this phase of the case. It is difficult to see how error can be ascribed to the Judge for not hearing 60(b) evidence. For the plaintiffs offered none, nor did they seek the right to produce testimony later. As with nearly all of the complaints they here assert, that position was not timely or properly asserted.

■ At the same time, it is the Court that has the obligation of giving effect to the aim of the Rule 60(b). Could the Court in the circumstances of this case really evaluate this "new evidence" on these affidavits and the ceaseless running comments of counsel? The facts, such as horizon elevations, core samples, tests and results were, to be sure, stated with factual detail, not just conclusions. But there were lots of areas in which these revelations needed to be tied down and into this case. Thus, for example, was sand *J-2* comparable to *A* sand? Did the core tests and analysis prove the absence of bentonitic sands? If so, would knowledgeable, experienced experts all substantially agree that it now being established that there were no bentonitic sands in the field, Kelso's April 18 use of water could not have damaged the well? That question is pertinent since experts testified on the trial that fresh water could damage wells in this area. One can read this as not being tied to presence or absence of bentonitic sands.

■ The reason these considerations loom so large is that in the particular manner the Judge charged the jury on Interrogatory No. 1, the jury's answer is, for all practical purposes, obscured in the impenetrable mystery of a general

11. "(b) * * * On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been dis-

covered in time to move for a new trial under Rule 59(b); * * * (6) any other reason justifying relief from the operation of the judgment. * * *."

Plaintiffs in their motion also relied on "misrepresentation" under ground (3) of 60(b), but we see no basis for relief under this subsection.

verdict. E. L. Cheeney Co. v. Gates, 5 Cir., 1965, 346 F.2d 197 [No. 21768, June 10, 1965]. This is no censure of the Judge. He was following the course so often and recently encouraged by us to exploit fully the marvelous flexibility of F.R.Civ.P. 49(a) with the use of a good, meaningful general charge with the verdict in the form of special interrogatories. But in doing so, unaided as he was from the absence of objections which would pinpoint the possible deficiencies of this submission, the Judge did not adequately test the interrogatories against possible answers [12] to assure, as far as reasonably possible, that all of the several significant decisive fact-legal questions were answered separately and distinctly. In this way most, or at least many, vexing problems wash out with the verdict itself. Fall v. Esso Standard Oil Co., 5 Cir., 1961, 297 F.2d 411, 417 n. 7; Warren Petroleum Co. v. Thomasson, 5 Cir., 1959, 268 F.2d 5, 9 n. 3.

Analyzed this way, Issue No. 1 really submitted three questions: (1) Did Marsh's acts do a damage? (2) Did Kelso's acts do damage? (3) Was there anything there to damage? The answer "No" is unrevealing. But what if the Judge on completion of a full 60(b) exploration before the Court to test the existence, relevance and persuasiveness of this "new evidence" reaches the conclusion that it would most likely cause a jury to hold that Kelso's acts could not have damaged the well? In that event the Judge cannot say for a certainty that the result on the trial would not have been different because the jury might have decided "No" on the productive incapacity alternative.

■ And this brings the responsibility again back to the Court. For, permissible as the charge was, this "double" or "triple" semi-general verdict—Issue No. 1—charge was the Court's. That the mystery is less perhaps than had there been nothing but a general charge and verdict is beside the point. The problem is not error in the charge. The problem is that of complicating the Court's task of reasonably satisfying itself that the jury verdict would not have been different since the manner chosen by it for submission makes it impossible to demonstrate this to a certainty.[13]

While the problem has become greater, and hindsight now shows that separate submission of the fact inquiries wrapped up in No. 1 would have eliminated it altogether, the Judge still has to determine ground (2) of his reasons for denying 60(b) relief. But this ought to be done against the background of judicial

12. All must reckon with the fact that the jury might put its own construction on the interrogatories. See, e.g., Rorem v. Halliburton Oil Well Cementing Co., 5 Cir., 1957, 246 F.2d 427, 432; and also see R. B. Company, Inc. v. Aetna Ins. Co., 5 Cir., 1962, 299 F.2d 753, which led us to remark:
    "The verdict is something less than satisfactory. But that does not necessary involve criticism of Court or counsel or jury. The fact is that one of the sometimes unexpected, but wholesome, result of special interrogatories jury submission is to emphasize the absolute necessity that there be first a clear understanding of the precise legal issues for jury resolution and then a translation of them into articulate questions which may be authoritatively answered by a simple categorical." 299 F.2d at 756.

13. Of course in any "newly discovered evidence" situation there is the vital discretion element in which the Judge inescapably has to measure the impact of the "new" against the whole record. But otherwise the predicament resembles somewhat that of a general jury verdict on alternative fact theories, only one of which turns out to be supported. When that happens the judgment cannot stand. E. L. Cheeney Co. v. Gates, 5 Cir., 1965, 346 F.2d 197, 200 and n. 4. [No. 21768, June 10, 1965]

certainty as to what the "new" evidence really is and amounts to.

We think the plaintiffs' paper showing, so far as it went, was quite strong and might well have led the jury to hold that Kelso's acts could not have damaged the well. But whether it will bear up when witnesses pro and con—from plaintiffs and defendants—are heard on the 60(b) hearing is another matter. Neither alone nor in conjunction with the balance of the record is it all one way. Thus, there is much doubt that the Kelso water damage defense was the "surprise" now made out. Kelso (through his counsel-co-litigant) thought enough about it to search out the supplier of the water ten days or so before he was called by the defendants to categorically refute Kelso's testimony about brine. Likewise, contrary to plaintiffs' claims, we hold that the question of productive capacity was for jury submission, not a directed verdict. On the other hand, the Trial Court could not seriously consider the contention made by the defendant to us that the plaintiffs were not diligent since they didn't drill a well to get cores upon which to refute Marsh's theory of water damage. The lawsuit was about the cost of a replacement well. It was complex enough without getting in a second one.

We therefore conclude that the 60(b) motion is sufficient to require a full judicial hearing in which fact and expert testimony would be focused on the rather narrow factual question (1) as to just what this "new evidence" shows as a factual matter, and (2) the legal question whether what it shows factually is of such character as to make it probable that a jury would decide that Kelso's April acts did not destroy the well. If the Court concludes as to (2) that a jury's likely decision would be uncertain, might go either way, or that putting water into the well would destroy it, then the 60(b) relief should be denied.

If the Court decides as to (2) that a jury would conclude that Kelso's acts did not destroy the well, then the Court must carefully balance, evaluate and weigh this against the whole record to determine whether the result would likely have been different. On accepted principles the Court will thereupon determine whether a new trial of all or appropriate issues is called for. Cf. Stilwell v. Travelers Ins. Co., 5 Cir., 1964, 327 F.2d 931; Aetna Ins. Co. v. Paddock, 5 Cir., 1962, 301 F.2d 807, 812; Peerless Ins. Co. v. Bailey Mortgage Co., 5 Cir., 1965, 345 F.2d 14 [May 12, 1965]. Obviously nothing said or unsaid, nothing expressed or implied is even the remotest suggestion of a possible whisper of an idea as to what the decision should be.

While we would emphasize that within its narrow scope the hearing is to be full to enable the Judge to make a judicial determination, we would sound a note of warning: it is not a retrial of the case.

This brings us back to the other claims made on the main appeal. As to each of them, we find either that there was no error or that the plaintiffs may not assert it. After reading the entire 1900-page record, we conclude that the Trial Court made acceptable rulings on evidence and use of explanatory charts, and that in the context of the full trial as it was haltingly unraveled by frequently frustrated and frustrating counsel, the Judge's remarks about the effect of the State Court judgment did not disparage it to the prejudice of the plaintiffs. The same is true as to the conditional submission, although perhaps the close scrutiny brought about by this appeal would point the way toward some changes in the submission were the case ever to be retried.

The overriding royalty owner plaintiffs present the intriguing theory that they were damaged by the June 3 letter of ouster and related acts of Marsh

whether or not the acts of Kelso destroyed the well. They rest this on the fact that the ouster and physical interference by Marsh was the basis for the State Court declaration that Kelso was excused from beginning reworking operations and had no duty to operate the lease so long as his title was in question. Therefore they did not receive the royalties from the lease they otherwise would have. Of course this theory transcends the *well,* Marsh No. 1, and asserts, in effect, that had Marsh not ousted Kelso, he would have had to drill another well (or wells) in order to maintain the lease.

Whatever there might be to this theory, it was not adequately or timely asserted. The effort to make requested Issues 3, 4, 5, and 6 (see note 9, supra) suffice will not do. These charges focused the inquiry on probable future production from "the Marsh #1 well" out of the *A* and *D* sands, respectively. There was no inquiry proposed as to lease-wide production. And again, no exception was taken or fair notice given to the Trial Judge that such a theory was being requested. More than that, these issues were tied to what productive capacity would have been "had not" the Marshes "tampered with the Marsh #1 well on * * * June 30."

Neither by requested charge or by objection was the Court fairly advised that the plaintiffs sought submission of lease-wide damage divorced from acts of Kelso or Marsh done directly to the well.

This thesis was, of course, presented by the overrides' post-verdict motion for additional findings. But by this time, with all the evidence being developed relative to the well rather than the lease, either way the jury chose to answer No. 1 in the negative—(a) destroyed by Kelso, (b) prior depletion—would defeat this theory. The motion thus called for a finding contrary to that found by the jury, and the Judge was not required to so find, nor can we give any relief.

Appeal in main case affirmed; appeal in 60(b) remanded.