James E. DOUGHERTY et al.,
Plaintiffs-Appellees,

v.

CONTINENTAL OIL COMPANY,
Defendant-Appellant,

Truman Arnold Distributing Co., Inc., Genico Distributors, Inc., and Reed Distributing Co., Defendants-Appellants.

No. 77–2373.

United States Court of Appeals,
Fifth Circuit.

Sept. 11, 1978.

John Feather, Dallas, Tex., for Genico Distributors, Inc.

Eugene L. Lefler, Beaumont, Tex., for Reed Distributing Co.

Edward Miller, Texarkana, Tex., for Truman Arnold Distributing Co.

B. J. Bradshaw, William R. Pakalka, Jerry E. Smith, Louis S. Zimmerman, Edward R. Adwon, Robert M. Craft, Houston, Tex., W. F. Palmer, Marshall, Tex., for Continental Oil.

Jim Ammerman, Don Stokes, Marshall, Tex., Jack Price, Austin, Tex., Stephen D. Susman, Tex Lezar, Mandell & Wright, Houston, Tex., for plaintiffs-appellees.

Before GEWIN, GODBOLD and MORGAN, Circuit Judges.

GODBOLD, Circuit Judge:

This is an antitrust case brought by commission agents of Continental Oil Company

(Conoco) against Conoco and some of Conoco's jobbers. In answers to special interrogatories the jury found that Conoco and its jobbers had violated § 1 of the Sherman Act and assessed damages against the defendants at approximately $8.4 million after trebling. We reverse.

The case arose out of Conoco's decision to reshape its methods of gasoline marketing in Texas. Prior to 1975 Conoco marketed branded gasoline in three ways. First, Conoco sold gasoline and gasoline products directly to the public from service stations owned and operated by Conoco. Second, Conoco sold gasoline to independent jobbers who stored it in their own distribution facilities, set prices, and resold the gas to consumers and other distributors. Third, Conoco consigned gasoline to commission agents who operated bulk plant facilities owned by Conoco and sold the gas to service stations, municipalities and quantity consumers such as farms. Conoco set both the sale prices and the commissions received by the commission agents.

In 1972 Conoco decided to abandon this vertical integration system in the Texas-Arkansas market by withdrawing the "Conoco" brand and converting to low cost self-service operations under the FasGas and E-Qual brands. To avoid terminating its commission agents selling "Conoco," Conoco gave them the options of going out of business, finding another supplier or purchasing the Conoco-owned bulk plants they operated and becoming jobbers in E-Qual gas. Many commission agents, some of whom are plaintiffs here, planned to purchase the facilities they were operating and become jobbers. The 1973 Arab oil embargo caused Conoco to suspend its market realignment before any E-Qual jobber contracts were consummated.

During this hiatus two Conoco jobbers, Wright and Arnold, proposed to Conoco that they purchase all Conoco's marketing facilities (service stations and bulk plants) in Texas and Arkansas. Conoco was willing to discuss such a plan provided that all the available assets were purchased. Conoco set a price of $22 million on the asset package. Wright and Arnold were unable to meet that price but suggested that they solicit bids from other interested parties to buy large parcels of assets. Conoco agreed, insisting that the negotiations be kept secret.

Wright and Arnold selected other Conoco jobbers they felt might have the interest and financial ability to participate in the plan. This group divided up the assets by geographic location, each person selecting an area encompassing his present area of operation. Each person submitted a bid for his area and negotiated separately with Conoco to purchase it. Most of the negotiations concluded successfully, resulting in the sale of about a dozen asset parcels. Other negotiations, such as Wright's, failed.

The plaintiff commission agents were informed in May 1975 that the bulk plants they were operating were being sold to the jobber defendants and that, rather than becoming jobbers themselves, they had only the option of continuing as commission agents for the purchasing jobbers or going out of business. The plaintiff agents sued Conoco and the purchasing jobbers, claiming that Conoco and the jobbers conspired in violation of the Sherman Act to exclude plaintiffs from becoming E-Qual jobbers as Conoco had promised in 1972. Plaintiffs contended that but for illegal territorial divisions and other restraints of trade Conoco would have sold the marketing assets to them instead of the jobber defendants. Alternatively, plaintiffs claimed that the restructured marketing scheme created restraints on trade that would not have occurred had Conoco acted on its original plan to permit the plaintiffs to become jobbers. The plaintiffs claimed as damages the difference between their incomes as commission agents and their projected incomes as jobbers.

The case was tried during 1977, when vertical territorial restraints were per se illegal under *U.S. v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). The district court submitted to the jury two Rule 49(a) interrogatories, one based on per se illegality and one based on

the rule of reason for general restraints of trade. The jury found for plaintiffs and against Conoco and the jobber defendants on both interrogatories.

The judgment must be reversed because of prejudicial errors committed by the district judge. During the pendency of this appeal, the Supreme Court in *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), discarded the *Schwinn* rule of per se illegality for vertical territorial restraints. Therefore, interrogatory 1, predicating liability on per se illegality, falls with *Schwinn*.

Interrogatory 2, basing liability on unreasonable restraints of trade, cannot support the verdict because it was infected by the now-erroneous *Schwinn* instruction. Also, as we discuss later in this opinion, the district judge did not ask the jury to make a finding of what constituted the relevant market but, as best we can tell, intended to make his own finding defining the relevant market, as he could do under Rule 49(a). Two errors occurred in the implementation of this approach. The district judge did not clearly apprise the jury of what he had found the relevant market to be. Second, whatever his finding, there was not sufficient evidence to support any definition of the geographic market. Finally, while the district judge correctly found the product market, there was insufficient evidence to support the jury's finding that the challenged restraints actually restrained trade in that product market.

### Interrogatory 1.

Interrogatory 1 clearly asked the jury to evaluate vertical territorial restrictions imposed by Conoco on the jobber defendants.

Do you find from a preponderance of the evidence that Continental Oil Company conspired with Defendants Gabbert, Arnold and Reed to divide territories between them, and restrict the geographic territory within which the Defendant Continental Oil Company would sell pe-

troleum products to the Defendants, and within which the Defendants would resell to customers located within such territories?

(Burden of proof on Plaintiffs.)

Answer yes or no.    Yes.

If this were inarguably a case of vertical restraints tried under the now discredited *Schwinn* per se rule, we would remand for proceedings consistent with *Continental T.V.*[1] See *Florida Harvestore, Inc. v. A. O. Smith Harvestore Products, Inc.*, 561 F.2d 631 (C.A.5, 1977); *Eastern Scientific Co. v. Wild Heerbrugg Instruments, Inc.*, 572 F.2d 883 (C.A.1, 1978); *Adolph Coors Co. v. A & S Wholesalers, Inc.*, 561 F.2d 807 (C.A.10, 1977). The appellees argue, however, that the case was not tried on a *Schwinn* theory at all but on a theory of horizontal market division. *Schwinn*, of course, did not alter the rule that horizontal market divisions are per se illegal. See *U.S. v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *U.S. v. Sealy, Inc.*, 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967). Thus, in appellees' view, *Continental T.V.* does not require reversal.

The relationship among the defendants has both vertical and horizontal elements. Vertically, Conoco, as a manufacturer and seller of petroleum products, agreed with entities at a lower level of the marketing chain, its jobbers, to sell them assets previously owned by Conoco. Horizontally, Conoco, as an owner and operator of both bulk plants and retail service stations, agreed with entities at the same market level, its jobbers, to sell them assets previously owned by Conoco. Thus, under settled antitrust doctrines, the Conoco-jobber dealings are capable of several characterizations.

Vertically, the transaction might be described, depending on anticompetitive purpose, as a unilateral refusal to deal with the commission agents, *U.S. v. Colgate*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), or as a vertical refusal to deal with the agents to further the anticompetitive motives of com-

---

1. We apply the law as of the time of appeal. See *Bradley v. Richmond School Bd.*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974);

*Hamling v. U.S.*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974).

petitors of the agents. *See U.S. v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966) (per se treatment). Or the sale to the jobbers could be evaluated under the rule of reason by characterizing the sale as Conoco's right to establish and terminate exclusive dealerships or franchises. *See, e. g., Universal Brands, Inc. v. Phillip Morris, Inc.*, 546 F.2d 30 (C.A.5, 1977); *Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245 (C.A.5, 1975). Given the agreement between Conoco and the jobbers, one might designate the transaction as a vertical group boycott to exclude competitors of the jobbers, thus invoking per se treatment. *See Klors, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Looking to the fairly routine nature of a sale of assets, the transaction could be seen as having a legitimate business purpose, imposing only incidental harm on competitors and thus qualifying for treatment under the rule of reason. *See Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (C.A.9, 1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). Finally, the transaction has elements similar to a vertical territorial allocation to be evaluated under *Continental T.V.*

■ It is also possible to fit the transaction under the rubric of horizontal restraints. Horizontal market divisions are of course per se illegal. *See Timken Roller Bearing Co. v. U.S.*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951). Entities in a seemingly vertical relationship may be deemed capable of horizontal restraints if they are actual or potential competitors. *See, e. g., U.S. v. Sealy, supra; U.S. v. Topco, supra.* Thus since Conoco operated bulk facilities and retail stations at the same marketing level as the jobbers, the arrangement theoretically could be given per se treatment as a horizontal market allocation among them. *See Hobart Bros. v. Malcolm T. Gilliland, Inc.*, 471 F.2d 894 (C.A.5), *cert. denied*, 412 U.S. 923, 93 S.Ct. 2786, 37 L.Ed.2d 150 (1973); *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230 (C.A.3, 1975); *cf. Pitchford v. Pepi, Inc.*, 531 F.2d 92 (C.A.3), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976). Or the relationship excluding the agents might be treated as a horizontal refusal to deal, *Associated Press v. U.S.*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) (per se illegal), a horizontal group boycott, *Fashion Originators Guild v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941) (per se illegal), or as a legitimate business agreement among horizontal competitors lacking anticompetitive purpose and thus to be judged under the rule of reason, *see Dalmo Sales Co. v. Tysons Corner Regional Shopping Center*, 139 U.S.App.D.C. 22, 429 F.2d 206 (1970); *cf. Hawaiian Oke, supra.*

■ We need not decide which, if any, of these substantive pigeonholes provides the proper framework for analyzing this case. Although the plaintiffs pleaded at least a concerted refusal to sell and that the defendants "establish[ed] exclusive trade territories and allocat[ed] trade territories" the district court's instructions and interrogatories irrevocably directed the jury's consideration to the abandoned *Schwinn* test. The district judge instructed the jury that:

> The plaintiffs' first theory of liability under Section 1 of the Sherman Antitrust Act is based upon the allegation that the defendant Continental Oil Company and the defendants Gabbert, Arnold and Reed combined and conspired to divide territories between themselves and restrict the geographical territories within which the defendant Continental Oil Company would sell the petroleum products to the defendants, which the defendants would resell to customers located within such territory.

Trial Transcript at 2635. This instruction is ambiguous and could cover either vertical or horizontal allocations. The charge taken as a whole, however, goes on to recapitulate the *Schwinn* test and makes clear that only vertical restraints were before the jury. The judge first apprised the jury of the repudiated property-ownership test of *Schwinn*:

> After a seller, in this case, Continental Oil Company, has parted with dominion

over his goods by selling them to another person, the antitrust laws prohibit the seller from restricting areas within which the goods or products can be resold, or customers to whom such products or goods can be sold.

Then the court clearly outlined the elements of a per se vertical violation under *Schwinn* :

> Thus, in order to recover under this theory, the plaintiffs must prove from a preponderance of the evidence that the defendants agreed to divide territories among defendants Gabbert, Arnold and Reed and further agreed that defendant Continental Oil Company would sell only to them within certain—such territories and, most importantly that Gabbert, Arnold and Reed would be restricted or limited to selling Conoco products within the defined territories and would not sell them in another territory except by agreement by and between them and Continental Oil Company.
>
> If you find that such an agreement existed between Continental Oil Company and other defendants and that this agreement was firmly and resolvably in force, then you will find that the defendants violated the antitrust laws in this regard and assess damages accordingly.
>
> On the other hand, it should be remembered that certain restrictions may be imposed by Continental Oil Company in reference to products not actually sold by them but rather transferred on consignment to Commission Agents.

In your deliberations of this, you are to keep in mind the distinction between actual sale and the transfer of property to be subsequently sold to a third party.

■■ Interrogatory 1 contains the same ambiguity as the charge. Taken alone this interrogatory conceivably submitted both per se illegal horizontal restraints and per se illegal vertical restraints.[2] Read against the background of the charge, however, the interrogatory refers only to the standards for vertical territorial restrictions. Since *Continental T.V.* changed these standards, remand is necessary to permit the sort of evidence and analysis essential to a rule of reason evaluation.

The rule of reason analysis required under interrogatory 2 cannot cure the deficiencies of interrogatory 1. The Court in *Continental T.V.* suggested that future juries evaluating vertical territorial restrictions should consider whether the decrease in intrabrand competition caused by the restriction was offset by an increase in interbrand competition. 433 U.S. at 54, 97 S.Ct. at 2559–2560, 53 L.Ed.2d at 584–85. The jury's attention was not focused on this critical factor. Moreover, as to the vertical restraints evaluated in interrogatory 1, any evaluation by the jury under the rule of reason standard of interrogatory 2 was largely illusory. Since the jury had been instructed that the restraints were per se illegal under interrogatory 1, they would have had no choice but to conclude that these same restraints were unreasonable

2. Plaintiffs contend on appeal that interrogatory 1 dealt solely with horizontal restraints and was thus untouched by *Schwinn*. We have rejected that argument. Plaintiffs' secondary argument is that the relationship between Conoco and its jobbers had both horizontal and vertical elements and thus Interrogatory 1 may be sustained on a horizontal theory even if the vertical theory must fall under *Schwinn*.

If in fact interrogatory 1 asked the jury to evaluate both vertical and horizontal restraints, it nevertheless could not support the verdict. An interrogatory encompassing two issues or issues in the alternative constitutes reversible error if the interrogatory is ambiguous or if one of the issues is incorrectly submitted to the jury. *See Prudential Insurance Co. v. Morrow*, 339 F.2d 411 (C.A.5, 1964); *Landon v. National*

*Building Corp.*, 415 F.2d 860 (C.A.6, 1969); *Scarborough v. Atlantic Coastline R.R.*, 190 F.2d 935 (C.A.4, 1951); *Seaboard Air Line R.R. v. Gill*, 227 F.2d 64 (C.A.4, 1955). An interrogatory containing multiple issues is really no better than a general verdict. *Laguna Royalty Co. v. Marsh*, 350 F.2d 817 (C.A.5, 1965). Such an interrogatory presents the same dilemma as a general verdict submitted to the jury on two theories of law, one of which is incorrect. Since we are unable to say whether the jury based its answer on a possibly correct theory of law (horizontal market division) or an incorrect theory (vertical territorial restraint) we would have no alternative but reversal. *See e. g., Smith v. Southern Airways*, 556 F.2d 1347 (C.A.5, 1977).

under interrogatory 2. *Cf. Heatransfer Corp. v. Volkswagenwerk, A. G.*, 553 F.2d 964 (C.A.5, 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978) (per se restraint ipso facto unreasonable).

### Interrogatory 2.

If interrogatory 2 were a correct and sufficient basis for liability the verdict could be saved. But it too was flawed.

The trial judge presented two alternative theories for liability under interrogatory 2. The first theory was the failure of Conoco to make the plaintiffs jobbers by selling the bulk plant assets to the jobber defendants. The second theory, developed late in the trial, was that the insertion of the jobber defendants as "middlemen" between the plaintiffs and Conoco created an unreasonable restraint of trade.

Rule of reason analysis was clearly appropriate for both these theories. *See Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126 (C.A.2, 1978) (en banc); *Knutson v. Daily Review, Inc.*, 548 F.2d 795 (C.A.9, 1976), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977); *Trixler Bro-*

kerage Co. v. Ralston Purina Co.*, 505 F.2d 1045 (C.A.9, 1974). Conoco strongly urges that the evidence was insufficient to support a finding that the termination of the plaintiffs as Conoco commission agents and the concomitant substitution of the jobber defendants was undertaken with anticompetitive intent.[3] We do not reach this sufficiency question, however, because the finding under interrogatory 2 fails for other reasons.

Because of the way in which the jury was instructed, we are unable to say that the taint of interrogatory 1 did not infect interrogatory 2. The jury was instructed that the second theory of liability was that "the actions of the Defendants amount to a general combination or conspiracy in restraint of trade. . . ." The jury was given little guidance in determining whether unreasonable restraints existed. Rather, the instruction stated that:

> The overt acts which the plaintiffs claim to have been committed pursuant to unreasonable restraint of trade are the same acts alleged to have been committed

resale price restrictions or territorial allocations, *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); or to increase the manufacturer's market dominance, *see Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); or if the manufacturer engages in predatory practices, *see Industrial Bldg. Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336 (C.A.9, 1970).

The trial judge instructed the jury on none of these explicit indicia of unreasonableness. Rather the jury was told that unreasonable restraints were "commercial transactions which tend to restrict production, raise prices, or otherwise control the market to the detriment of purchasers or consumers of goods and services. . . ." This standard insufficiently distinguishes unreasonable restraints from reasonable ones. The rule of reason, while it permits a broad-ranging inquiry into the effect of trade restraints, requires more than simple proof of restraints. Unless the jury is given an analytical framework for judging the anticompetitive intent and effect of trade restraints, the rule of reason becomes nothing more than a rule of evidence permitting the plaintiff to raise an inference of unreasonableness from the mere proof of restraints.

---

**3.** As the trial judge noted in his instructions, a manufacturer generally may determine the method of distribution. *Burdett Sound, Inc. v. Altec Corp., supra; Fray Chevrolet Sales, Inc. v. General Motors Corp.*, 536 F.2d 683 (C.A.6, 1976). A manufacturer may terminate even a successful distributor and select another distributor even if the arrangement was solicited by the second distributor. *See, e. g., Oreck Corp. v. Whirlpool Corp., supra; Knutson v. Daily Review, Inc., supra; Universal Brands, Inc. v. Phillip Morris, Inc., supra; Kestenbaum v. Falstaff Brewing Corp.*, 514 F.2d 690 (C.A.5, 1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976); *Packard Motor Car Co. v. Webster Motor Car Co.*, 100 U.S.App.D.C. 161, 243 F.2d 418, *cert. denied*, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957); *Ace Beer Distributors, Inc. v. Kohn, Inc.*, 318 F.2d 283 (C.A.6), *cert. denied*, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963). The selection of one distributor or method of distribution violates § 1 only if the purpose or effect is anticompetitive. Thus the action is illegal only if taken expressly to drive the plaintiff out of business, *see E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Comm.*, 467 F.2d 178 (C.A.5, 1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973); or in an attempt to monopolize, *see Universal Brands, supra*; or to fix prices, *id.*; or to force the plaintiff to accept

pursuant to territorial restrictions. That is, agreement, combination or conspiracy between the defendants to divide territories and within such territories to sell the bulk plant stations and equipment operated by plaintiffs to defendants Gabbert, Reed and Arnold, and to refuse to sell Conoco products directly to the plaintiffs but required them to purchase them through the defendants in their respective areas.

The instruction thus included the vertical restraints analyzed in interrogatory 1 within the scope of interrogatory 2.. Since the jury had already been instructed in regard to interrogatory 1 that if such restraints existed they were unreasonable it is possible that the erroneous *Schwinn* instruction poured over into interrogatory 2. Just as we are unable to say that the jury decided interrogatory 1 on the arguably correct theory of horizontal restraints rather than the patently incorrect *Schwinn* theory, we are also unable to speculate that the jury's consideration of an amalgam of trade restraints including vertical restraints was based on proper balancing under the rule of reason rather than on the erroneous conclusion that vertical territorial restraints are illegal by definition.

▮▮▮▮ This is not to say that an antitrust case may never be submitted to the jury on both per se and rule of reason theories. Rather, the jury must simply be given means of segregating per se illegal restraints from those judged under the rule of reason. Although the allegation that a course of conduct imposes a general restraint of trade may suffice under the liberal federal pleading rules, the jury must be given guidance as to the specific acts that constitute a restraint of trade. To do less would render the benefit of special interrogatories nugatory and convert the rule of reason into a license to perform a less than exact analysis of the anticompetitive effect of a defendant's conduct.

▮▮▮▮ Plaintiffs argue on appeal that any spillover effect from interrogatory 1 is harmless because the vertical-horizontal restraints were in fact unreasonable under

classical rule of reason analysis. Even if this assertion were correct, we could not affirm because of other errors in the submission of interrogatory 2. To prove an antitrust violation under the rule of reason a plaintiff must show that the challenged acts or conduct adversely affected competition. This showing can only be made by evaluating the operation of the restraint in the context of a defined geographic and product market, because "[a]n antitrust policy divorced from market considerations would lack any objective benchmarks." *Continental T.V., Inc.,* 433 U.S. at 53 n. 21, 97 S.Ct. at 2560, 53 L.Ed.2d at 583 n. 21. *See Northwest Power Products, Inc. v. Omark Industries, Inc.,* 576 F.2d 83 (C.A.5, 1978). An antitrust plaintiff thus makes out a prima facie case under the rule of reason only upon "proof of a well-defined relevant market upon which the challenged anticompetitive actions would have had a substantial impact." *Cornwell Quality Tools Co. v. CTS Co.,* 446 F.2d 825 (C.A.9, 1971), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 715, 30 L.Ed.2d 740 (1972); *Knutson v. Daily Review, Inc., supra; Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 512 F.2d 1264 (C.A.9, 1975); *Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338 (C.A.3, 1975).

The district judge did not submit the issues of geographic and product markets to the jury. Under Rule 49(a), when special interrogatories are used any issue of fact not submitted to the jury may be found by the trial judge; in the absence of an explicit finding we imply a finding consistent with the verdict. Taken as a whole, the instructions and interrogatory 2 indicate to us that the district judge intended to make findings on geographic and product markets. He did not, however, clearly inform the jury what his finding was with respect to geographical market.

The district judge first outlined plaintiffs' theory that the defendants had restrained "the trade of gasoline marketing *in the State of Texas . . . .*" (emphasis added) The next sentence, however, uses a different market definition:

Plaintiffs . . . must prove by a preponderance of the evidence that the combination or conspiracy, if any, imposed unreasonable restraints on interstate commerce, and operated to the public injury by adversely affecting the price, quantity, quality, availability or service in the retail distribution of petroleum products *in the areas serviced by the plaintiffs.* (emphasis added)

Shortly thereafter, in the instruction on franchise termination, the court instructed that Conoco's establishment of the jobbers as exclusive dealers would not violate the antitrust laws "unless these acts were knowingly done pursuant to an agreement, arrangement, or understanding between the Defendants that unreasonably restrained the trade or commerce of gasoline marketing *in the State of Texas.*" (emphasis added) The interrogatory, however, asked whether the restraints "operated to the public injury by adversely affecting the price, quantity, quality, availability or service in the retail distribution of petroleum products *in the areas serviced by the Plaintiffs.*" (emphasis added) Thus, it was not clearly stated to the jury whether the court had found the geographic market was "areas serviced by the plaintiffs" (but less than the State of Texas), or the State of Texas, or "areas serviced by the plaintiffs," which area was the State of Texas. The jury could evaluate the challenged restraints only in relationship to a clearly defined market. The ambiguity in the instructions and interrogatory 2 made it impossible for the jury to perform the relational analysis required by the rule of reason.

Whatever geographic market finding may have been intended, there was not sufficient evidence on which the judge could base a finding. The evidence does not tell us whether the plaintiffs competed solely within their towns, within larger county areas, or whether consumers looked to an even broader geographic area to select petroleum products. *See Lehrman v. Gulf Oil Corp.,* 464 F.2d 26 (C.A.5), *cert. denied,* 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972), *on remand,* 500 F.2d 659, (C.A.5, 1974), *cert. denied,* 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975) (small town service stations competed with stations in nearby city). Even less evidence suggests that the relevant market was statewide. The nine plaintiffs were checkered across the breadth of the state and clearly did not compete across this large area.

■ We also conclude that the district judge found the product market to be all brands of gasoline. Although the product market is not explicitly mentioned, the instructions and interrogatory consistently refer to "gasoline" generically.[4] All brands of gasoline generally are considered to constitute the product market. *See Cities Service Oil Co. v. Coleman Oil Co.,* 470 F.2d 925 (C.A.1, 1972), *cert. denied,* 411 U.S. 967, 93 S.Ct. 2150, 36 L.Ed.2d 688 (1973); *Mullis v. Arco Petroleum Corp.,* 502 F.2d 290 (C.A.7, 1974).

Based on such a finding the verdict cannot stand. No evidence suggests that the challenged actions operated to restrain trade in such a broad product market. The plaintiffs spent much of their case demonstrating that the jobbers discouraged farm accounts (major customers for many of the plaintiffs), encouraged self-service accounts,[5] restricted customer credit, and abandoned discounts to municipalities. The plaintiffs also introduced evidence that their costs and prices were higher than under Conoco. This evidence confuses injury to competitors with injury to competition. The complaining party must show some restraint "beyond the loss of business suffered by the distributor or the market's loss of a distributor-competitor." *Knutson v. Daily Review, Inc., supra,* 548 F.2d at 803. The restraint exists only if the plaintiff can

---

4. The relevant product market is composed of products that have reasonable interchangeability for the purposes for which they were produced—price, use and qualities considered. *Coleman Motor Co. v. Chrysler Corp., supra.*

5. On remand the district judge may find it appropriate to consider whether full-service and self-service stations constitute separate product markets.

show the defendant's dominant position in some relevant market and that an actual restraint occurred in the marketplace. *Id.* The plaintiffs never showed that Conoco or the jobber defendants had market power to set prices or practices in the product market as defined by the district judge.

REVERSED and REMANDED.